## ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY v. RAMSEY.

### Opinion delivered July 11, 1910.

1. MASTER AND SERVANT—DUTY IN OPERATING RAILROAD.—The duty of opening and closing switches is one which devolves upon the railroad company, rendering it liable where the negligence of a fellow servant in this regard injures an employee. (Page 38.)

2. SAME—NEGLIGENCE—PRESUMPTION.—Where a railroad switch was left open, so that a train ran into it, whereby plaintiff's intestate, an employee of defendant railroad company, was killed, a *prima facie* case of negligence is made out against the railroad company. (Page 39.)

3. SAME—PRESUMPTION OF NEGLIGENCE—REBUTTAL.—Where the presumption of negligence on the part of a railroad company in regard to leaving open a switch, whereby a train was derailed and plaintiff's intestate killed, was overcome by reasonable and uncontradicted proof showing that the railroad employees were not negligent, a verdict for the plaintiff will be set aside. (Page 39.)

Appeal from Faulkner Circuit Court; *Eugene Lankford,* Judge; reversed.

#### STATEMENT BY THE COURT.

This is a suit brought by E. A. Ramsey, administrator of the estate of S. J. Calhoun, deceased, against the St. Louis, Iron Mountain & Southern Railway Company. The complaint alleges that on the 2d day of January, 1908, the deceased, S. J. Calhoun, was a locomotive engineer employed by the defendant; that on that day, at about the hour of 6 o'clock P. M., while the deceased was in the performance of his duty as engineer of a through freight train going north on the main line of the defendant's railroad, the engine ran into an open switch at Campbell, in Jackson County, Arkansas, and turned over, and in the wreck the said S. J. Calhoun was caught between the cab and tender and instantly killed. The defendant was negligent in permitting the switch to be open, and its negligence caused the death of the said S. J. Calhoun; that said S. J. Calhoun left surviving him as his next of kin five brothers, towit: John Calhoun, W. R. Calhoun, Malcolm Calhoun, Louis Calhoun and C. T. Calhoun, and three sisters, Mrs. D. Martin, Mrs. J. M. Bell and Mrs. Elizabeth Hyatt. The said S. J. Calhoun also left surviving him his wife, Lula Calhoun, aged .... years, who

was dependent upon him for support, and to whose support he contributed the sum of $125.00 a month. The said S. J. Calhoun was 47 years of age, in good health and industrious, and earning at the time of his death $150.00 a month. This suit is prosecuted for the benefit of the wife and next of kin of the deceased. And the plaintiff as such admisintrator was damaged by the death of the said S. J. Calhoun, caused by such negligence of the defendant as aforesaid, in the sum of $20,000. Wherefore the plaintiff, as administrator, prays judgment against the defendant for the sum of $20,000.

The defendant railway company answered, denying liability, and averred that the switch was opened by a stranger, and was not left open by the defendant, or by any of its agents, employees or servants.

There was a trial before a jury, which resulted in a verdict for the plaintiff in the sum of $7,500. From the judgment rendered the defendant has duly prosecuted an appeal to this court.

*W. E. Hemingway, E. B. Kinsworthy,* and *James H. Stevenson,* for appellant.

The verdict is not supported by the evidence. 79 Ark. 76; 74 Ark. 19; 79 Ark. 437; 90 Ark. 326; 44 Ark. 524; 46 Ark. 555; 51 Ark. 467; 77 Ark. 367; 48 Ark. 460; 179 U. S. 658; 139 Fed. 737; 132 Fed. 593; 142 Fed. 320; 114 Fed. 739; 70 Ia. 561; 119 Ga. 837.

*J. H. Harrod,* for appellee.

Appellant waived the alleged error in the court's refusal to dismiss the case at the close of plaintiff's testimony by introducing evidence. 79 Ark. 401.

HART, J., (after stating the facts). It is earnestly insisted by counsel for appellant that the evidence did not warrant the verdict. The complaint does not allege that the switch or any of its appliances was defective, but only alleges that the defendant negligently permitted it to be left open and so to carry the decedent's train from the main track to the side track, where it was derailed, causing the death of the engineer. Hence it will be seen that the negligence complained of was not in the construction, preparation or repairs of the railroad, but in its operation. Hence the character of the duty (the opening and closing of the switch), the negligent performance of which is

alleged to have caused the injury, was a duty in relation to the operation of the railroad. 3 Elliott on Railroads, § § 1276 and 1318; 26 Cyc. 1127-8 and 1325; *Chicago, I. & L. Ry. Co.* v. *Barker* (Ind.), 14 Am. & Eng. Ann. Cases, 375, 17 L. R. A. (N. S.) 542 and notes to same; *Houston & T. C. R. Co.* v. *Shapard,* 118 S. W. (Tex. Civ. App.) 596.

While the duty to operate carefully rests upon the servants of the railway company, in view of our fellow servant act, it becomes immaterial to ascertain what servant is careless in that respect; for the railway company is liable for the negligent acts of the fellow servants of the complaining party. *St. Louis, I. M. & S. Ry. Co.* v. *Davis,* 93 Ark. 484.

It is not disputed that the switch was open, and that the train ran into it and became derailed, thus causing the death of the engineer. While, in an action against a railroad company by an employee to recover damages, negligence of the railroad company will not be presumed from the happening of the accident, but must be proved by the plaintiff, yet it follows from the authorities cited that a *prima facie* case of negligence against the defendant company in the operation of its trains was made out by the plaintiff by showing that the switch was open, and that the train ran into it whereby engineer Calhoun was killed. No other evidence was adduced at the trial tending to show negligence on the part of the railway company.

The remaining question, then, is, was this presumption of negligence overcome by the evidence in behalf of the defendant company? We think it was. From the evidence it appears that Campbell's switch is what is known as a "blind switch." That is, it has no telegraph station or agent. It is north of Newport, Arkansas, between Diaz on the south and Tuckerman on the north. It is about 2:05 miles north of Diaz and a little over six miles south of Tuckerman, both of which are telegraph stations. The train sheets were introduced showing the times all trains passed Newport, Diaz and Tuckerman on the day the accident occurred.

Extra No. 67, northbound, (the derailed train) left Newport at 5:50 P. M. on the day in question. According to the testimony of its conductor, it ran into the open switch at about 6:05 P. M., and this was about the time it was due to arrive at Campbell's switch according to its schedule. The northbound

trains preceding it were Nos. 92 and 66. No. 92 was a local freight, which left Newport at 2:25 P. M. It passed Diaz at 2:44 P. M., and should (by estimate) have passed Campbell's switch about eight minutes later. No. 66, northbound, left Newport at 3:45 P. M., passed Diaz at 3:55 P. M., and Campbell's switch at about 4:02 P. M. The last train that passed Campbell's switch on the day the accident happened before No. 67 was derailed there was No. 3. It was a southbound fast passenger train. It passed Tuckerman at 5:29 P. M., and Campbell's switch from six to eight minutes later. It passed Diaz at 5:40 P. M., and arrived at Newport at 5:45 P. M. Extra No. 67 (the derailed train) waited at Newport for No. 3 to reach there. The engineers and conductors of these trains were introduced as witnesses, and testified that their trains passed Campbell's switch without stopping. The section foreman who had that portion of defendant's track, including Campbell's switch, testified that the wreck occurred at about 6 o'clock P. M.; that he had lighted the switch lights there at something like 5:30 P. M. that day; that the switch was closed then; that he saw no trains on the switch on that day. The switch and switch stand were examined by the person in charge of the wrecking crew, which came from Newport soon after the acident happened. He said that the switch was thrown for the side track, and was in good condition; that there was nothing wrong except the switch lock; that the broken lock was hanging to its chain, and the face of the lock was all battered up and indented; that the switch point was all right; that it was not possible for the switch to have been opened when No. 3 passed coming south, and not have been damaged thereby; that there were some of the wheels of the cars right on the points of the switch, so that they could not have been thrown after the wreck; that the switch lock was freshly broken.

The general superintendent of the railroad said Campbell's switch was used only in cases of emergency, and that whenever possible train dispatchers avoid having trains meet at places other than telegraph stations; that, if the switch at Campbell's had been lined up for the side track when No. 3 came south, the switch would have been damaged in several places, and would have to be repaired; that either the points would be bent or the switch stand damaged or broken.

A civil engineer testified, as an expert, that if the switch had been set for the side track it would have been impossible for a train coming south at the rate of 30 or 35 miles an hour to run through it without damaging it or tearing it up; that, had it been open, the connecting rod and bridle point and the rod which connects the points to the switch stand, one or all of them, would be broken; that if a train is running fast it will break the switch stand, and if it is running slow it will bend the switch points.

A Mrs. Mattie Walton testified that shortly after the wreck she overheard a conversation between a man named Bill Sharp and her husband, in which Sharp stated that he had broken the lock and thrown the switch.

It will be seen that the last train going north before the accident happened was No. 66. It passed Campbell's switch at about 4 o'clock P. M., and did not stop there. It is evident that the switch was then closed and lined up for the main track; for, if the switch had been open, that train would have gone on the sidetrack. This was about two hours before the accident happened. The next train that passed was No. 3, a fast passenger, going south. It passed Campbell's switch at 5:35, about one-half hour before the accident happened. The testimony shows that, if the switch had been open then, the passing of the train would have either broken the switch stand or have bent the switch stand or have bent the switch points, according to whether the train was running fast or slow. In addition to this, the train crew of that train testified that the switch was lined up for the main track when their train passed; and gave, as a reason therefor, that they could tell by the motion of the train whether a switch was open or closed. The switch stand was found to be in perfect condition except that the lock was broken; and its appearance indicated that it was freshly done. This makes it appear, as nearly as human testimony can establish a fact, that the switch was not left open by the employees of the company.

There can be but two theories as to the unfortunate accident. One is that the employees of the trains which passed the switch just before the occurrence are not telling the truth, and the other is that a stranger broke the lock and threw the switch for the side track.

As to the former, there is nothing to warrant the finding of the jury. The testimony of the witnesses introduced by the railroad company was uncontradicted, and was reasonable and consistent; and the jury had no right to arbitrarily disregard it. When it is given probative force, it overcomes the presumption of negligence arising from the operation of trains, established by the proof that the switch was open. Then, too, there was some evidence, however weak it may be, that the switch lock was broken and the switch opened by a stranger. We refer to the testimony of Mrs. Mattie Walton as to statement of Bill Sharp that he had broken the switch lock and set the switch for the side track, which testimony was not objected to, and was entitled to some probative force.

The evidence did not support the verdict; and the judgment will be reversed, and the cause remanded for a new trial.